IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WIOLETTA SMOTER and JOANNA TARASZKA, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE MENTHOLATUM COMPANY, INC.,<br><br>Defendant. | Civil Action Case No.<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiffs, Wioletta Smoter ("Smoter") and Joanna Taraszka ("Taraszka") (Smoter and Taraszka together, "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this class action against Defendant, the Mentholatum Company, Inc. (hereinafter "Defendant"), and allege as follows:

I. INTRODUCTION

1. This class action is brought by Plaintiffs on behalf of all consumers who purchased Defendant's OXY® Advanced Care™ Rapid Spot Treatment and OXY® Advanced Care™ Soothing Cream Acne Cleanser (the "Products").

2. Each of the Products contains the active ingredient benzoyl peroxide ("BPO"). Defendant touts BPO as "the #1 dermatologist recommended acne-fighting ingredient" that is "[c]linically proven to kill acne-causing bacteria for visibly clearer skin."[1]

---

[1] *See* https://us.mentholatum.com/oxy/

3.    What Defendant fails to mention, however, is that BPO degrades over time into benzene.  Benzene is a known carcinogen that has been linked to cancer.  In fact, the Food and Drug Administration ("FDA") has identified benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity," unless its "use is unavoidable in order to produce a drug product with a significant therapeutic advance," in which case benzene levels should be restricted."[2]  BPO products do not constitute a significant therapeutic advance, and therefore, any significant detection of benzene should be deemed unacceptable.[3]

4.    Nevertheless, despite knowing that the Products contain BPO, and that BPO degrades into carcinogenic benzene, Defendant failed to take steps to prevent inclusion of benzene in the Products, and failed to disclose to consumers the hazards presented by the Products, all while touting the safety of the Products.  Defendant's manufacturing and marketing of the Products violate both federal and state law, in that the Products fail to comply with FDA Current Good Manufacturing Practices, are adulterated, and violate public policy regarding consumers' health and safety.

5.    Plaintiffs and Class Members reasonably relied on Defendant's representations that the Products were unadulterated and free of any carcinogens when they purchased the Products.  Plaintiffs and Class Members would not have purchased the Products, or would have paid less for the Products, had Defendant disclosed that Products contained benzene or risked containing benzene.

---

[2] https://assets-global.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf
[3] *Id*.

6. Plaintiffs therefore bring the following action for damages incurred in connection with their purchases of Defendant's Products.

## II. PARTIES, JURISDICTION, AND VENUE

7. Plaintiffs are residents and citizens of Illinois, who purchased the Products during the relevant time period.

8. Defendant is a Delaware corporation with its principal place of business in New York.

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) because: (1) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiffs and Defendant are citizens of different states.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## III. FACTUAL ALLEGATIONS

### A. DEFENDANT'S HISTORY IN THE INDUSTRY

11. Defendant was founded in 1889 in Wichita, Kansas. [4]

12. Defendant started out as a small purveyor of soaps and toiletries. But, over time, it grew into a global health and wellness company that represents to consumers that its products are of high quality.[5] Thus, Defendant has spent over 100 years gaining consumers' trust.

---

[4] https://us.mentholatum.com/about-us/
[5] *Id.*

13. Defendant distributes and sells many skin care and acne related products across the United States and in Illinois.

14. Those products include the OXY® line of products (including the Products), which are designed to "deliver[] innovative acne solutions."[6] According to Defendant, "No one knows teen acne like OXY®. Since 1974, we've been a go-to brand for strong and effective solutions for stubborn acne."[7] "No matter your background, color, size, or skin type, if you have acne-prone skin we've got a solution for you."[8]

15. The OXY Products purchased by Plaintiffs contain 10% Benzoyl Peroxide.

16. In particular, Defendant's OXY® Advanced Care™ Rapid Spot Treatment appears to consumers as follows:



---

[6] https://oxyskincare.com/pages/about-oxy%C2%AE-skin-care
[7] *Id*.
[8] https://oxyskincare.com/pages/our-commitment-to-you

17. Defendant's OXY® Advanced Care™ Soothing Cream Acne Cleanser appears to consumers as follows:

 

18. In conjunction with its advertising and marketing of OXY products, Defendant represents that its products—including the Products—are harmless. In particular, Defendant's website states as follows:

The Mentholatum Company Reassures on the Safety and Efficacy of Our OXY® Acne Care Products

Amidst ongoing discussions concerning the safety and efficacy of acne care products, we at The Mentholatum Company wish to reassure our consumers and stakeholders about the integrity and quality of our OXY® Acne Care line.

We stand firmly behind the safety and effectiveness of all our OXY® Acne Care products. We emphasize that, when used and stored according to the instructions on their labels, these products deliver the promised benefits. We evaluate and test our products under real time and storage conditions, supporting their safe use when OXY® Acne Care products are stored below 100°F (38°C) as instructed on product labels. The health and well-being of our consumers are our top priorities, ensuring all our products not only meet but exceed the standards set by regulatory bodies.

Quality assurance is the cornerstone of our mission. Our commitment to rigorous testing and compliance with all applicable regulations is a foundational principle that guides our operations. We are proud to affirm that our products and manufacturing facilities comply fully with the regulations set forth by the Food and Drug Administration (FDA) and meet the stringent requirements outlined by the United States Pharmacopoeia (USP).

Our dedication to maintaining the highest standards of quality and safety is unwavering. Our commitment to excellence is evident in the meticulous care and attention to detail applied throughout our manufacturing process, from the selection of ingredients to the final product testing.

We appreciate the trust our consumers place in our products and are committed to continuing to earn that trust. We invite our customers to reach out with any questions or concerns and pledge to maintain open lines of communication.

For more information about our OXY® Acne Care products or to learn more about our commitment to quality and safety, please email consumeraffairs@mentholatum.com.

- OXY® Acne Care

19. Defendant's representations, however, are inaccurate, unfair, deceptive, and misleading. As set forth below, the Products contain or present the risk of exposure to benzene, and accordingly, the Products are not developed, tested and sold in compliance with FDA rules, regulations, and good practices. As a result, the Products are adulterated, unfit for sale, and are worth far less than what the Plaintiffs paid for the Products.

20. Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, and therefore must and rely on Defendant to report truthfully and honestly what the Products contain on the Products' marketing, packaging and labels.

B. **DANGERS PRESENTED BY THE PRODUCTS**

21. The carcinogenic properties of benzene are well documented, as noted by the Centers for Disease Control and Prevention ("CDC").[9] Benzene has long been directly associated with cancer in humans.[10]

22. Long-term exposure to high levels of benzene can cause leukemia, a cancer of the blood-forming organs. Long-term exposure to benzene additionally causes harmful effects on the bone marrow and can cause a decrease in red blood cells, leading to anemia. It can also cause excessive bleeding and can affect the immune system, increasing the chance for infection.

23. Humans can become exposed to benzene through "inhalation, skin absorption, ingestion, skin and/or eye contact."[11]

---

[9] https://emergency.cdc.gov/agent/benzene/basics/facts.asp
[10] https://assets-global.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf
[11] *Id.*

24. BPO, which is a diacyl peroxide with bacterial activity and is widely used as a treatment for acne, degrades over time to form benzene.[12] BPO can thermally decompose to form two molecules of benzoic acid radicals that can further decompose to benzene radicals with liberation of carbon dioxide.[13] The benzene radicals can then produce benzene.[14] This process can be accelerated by exposure to elevated temperatures, such as those present in a hot bathroom or shipping container. The connection between BPO and Benzene has been documented since at least 1994.[15]

25. The FDA classifies Benzene as a Class 1 compound.[16] According to the FDA, "Solvents in Class 1 should not be employed in the manufacture of drug substances, excipients, and drug products, because of their unacceptable toxicity or their deleterious environmental effect."[17] However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted, and benzene is restricted under such guidance to 2 parts per million ("ppm").[18] As set forth below, the benzene concentrations that have been found in BPO-containing products, like the Products, far exceeds 2ppm.

C. **VALISURE'S TESTING OF THE PRODUCTS**

26. Valisure LLC ("Valisure") is an analytical laboratory and an online pharmacy known for its rigorous testing of medications and healthcare products to ensure their safety, quality, and consistency.

---

[12] *Id*.
[13] *Id*.
[14] *Id*.
[15] https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide
[16] https://www.fda.gov/media/71737/download
[17] *Id.*
[18] *Id.*

7

27. On March 6, 2024, Valisure announced that BPO acne treatment products are unstable and form benzene.[19]

28. Valisure tested dozens of prescription and over-the-counter benzoyl peroxide products, including OXY products containing 10% BPO. Valisure's study indicated that currently formulated BPO medications are fundamentally unstable and can generate unacceptably high levels of benzene when handled or stored at higher temperatures that the products may be exposed to during handling by consumers.[20]

29. Valisure's tests show that on-market BPO products can form over 800 times the conditionally restricted FDA concentration limit of 2 parts per million (ppm) for benzene, and the current evidence suggests that this problem applies broadly to BPO products currently on the market.[21] High levels of benzene were not only detected inside BPO products, but also in the air around incubated BPO products, showing that benzene can leak out of some product packages and pose a potential inhalation risk.[22] Incubation of a Proactiv® product at the temperature of a hot car (70°C) resulted in the detection of benzene in a compact car's volume of air at ~1,270 times the Environmental Protection Agency's ("EPA") calculated threshold for increased cancer risk by long-term inhalation exposure to benzene.[23] Valisure is requesting market withdrawal of BPO-containing products.[24]

30. Valisure's data suggests that only BPO-containing acne treatment products form high levels of benzene, and that other acne treatment products tested by Valisure, such as those

---

[19] https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*

containing salicylic acid or adapalene, do not appear to present the same danger.[25] Moreover, Valisure indicates that, with respect to BPO, effective methods exist to prevent the formation of benzene:

> Antioxidants are often used to prevent or inhibit thermal degradation processes and Petitioner investigated a few common antioxidants in a model system of therapeutically relevant 10% BPO in glycerol. The results summarized . . . below show that the addition of an antioxidant can substantially reduce the formation of benzene by over 98% in a formulation representative of a drug product. These and other techniques that could help address the BPO degradation problem in drug product formulations have been detailed in a recent patent filing.[26]

31. Valisure has previously identified cosmetics and drugs that were inadvertently contaminated with benzene. In contrast here, Valisure stated: "This discovery of benzoyl peroxide's fundamental instability and formation of benzene is substantially different than Valisure's previous findings of benzene in sunscreens, hand sanitizers and other consumer products. The benzene we found in sunscreens and other consumer products were impurities that came from contaminated ingredients; however, the benzene in benzoyl peroxide products is coming from the benzoyl peroxide itself, sometimes at hundreds of times the conditional FDA limit. This means the problem broadly affects benzoyl peroxide products, both prescription and over-the-counter, and necessitates urgent action."[27]

32. The Valisure study found unacceptable levels of benzene in an OXY product containing 10% BPO.[28] Both of the Products at issue here contain 10% BPO.

    D.    **DEFENDANT'S REPRESENTATIONS RELATING TO THE PRODUCTS**

---

[25] *Id.*
[26] https://assets-global.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf
[27] https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide
[28] https://assets-global.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf

33. Although Valisure's study found that Defendant's OXY 10% BPO cream contained benzene that far exceeds the FDA limit, Defendant does not list benzene among the active or inactive ingredients anywhere on its website or on the Products' labels themselves. Nor does Defendant, in its statements purporting to tout the safety of its products, disclose that BPO products (like the Products) contain, or are at risk of containing, benzene – a known carcinogen.

34. Defendant's Products are "drugs" that are regulated by the FDA, pursuant to the federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, as well as analogous state statutes and regulations.

35. Under the FDA's Current Good Manufacturing Practices ("CGMPs"), drug manufacturers like Defendant must have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100. A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity." 21 C.F.R. § 211.160.

36. The FDA has noted that "Class 1 solvents such as benzene should not employed in the manufacture of drug substances, excipients, or drug products because of their unacceptable toxicity."[29] Accordingly, "Drug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm."[30] "[M]anufacturers who identify risks of benzene contamination from drug

---

[29] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs
[30] *Id.*

components or confirm the presence of benzene in a drug product should also take steps to use ingredients without benzene, or, if justified, use suppliers that minimize risk of unacceptable benzene impurity levels."[31]

37. As noted above, the FDA has clearly indicated that benzene should not be included—in any amount—in FDA-regulated products, unless the inclusion is unavoidable, in which case, the amount of benzene shall not exceed 2 ppm.

38. The inclusion of benzene in the Products is not unavoidable. In any event, as Valisure discovered, OXY products containing 10% BPO contain far more than 2 ppm of benzene.

39. Defendant could have avoided any potential for inclusion of benzene in the Products by changing the manufacturing process or ingredients. Indeed, other forms of OTC acne treatments do not contain BPO and do not contain significant amounts of benzene. Additionally, as Valisure noted, there are methods by which the potential for benzene can be reduced in products containing BPO.

40. On information and belief, Defendant was aware of the degradation issues associated with benzoyl peroxide, as the harms associated benzoyl peroxide were known within scientific literature. Nevertheless, despite the documented ability to BPO to form carcinogenic benzene, Defendant did not employ any method to reduce the risk of benzene inclusion in the Products.

41. Accordingly, Defendant failed to comply with CFMPs and FDA guidance in its manufacturing of the Products.

---

[31] *Id.*

42. Drug products not manufactured in accordance with CGMPs are deemed "adulterated." *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B).

43. The FDCA prohibits "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).

44. The Illinois Food, Drug and Cosmetic Act ("IL FDCA") has expressly adopted the federal labeling requirements, and the definition of "adulterated" as defined by 410 ILCS 620/14 mirrors the FDCA's definition.

45. Accordingly, the products are unfit for sale and have no value whatsoever.

46. Moreover, while disclosing the "ongoing discussions concerning the safety" of BPO, Defendant reassures consumers that its products are safe, and neglects any mention of the dangers presented by its BPO products, specifically, that they contain or present a risk of containing benzene.

47. While Defendant disclosed the presence of BPO in the Products, it failed to disclose the presence of benzene, despite its knowledge of the presence of benzene or the risk of the presence of benzene in its products.

48. Defendant's misrepresentations of the dangers presented by the Products led reasonable consumers, like Plaintiffs and Class Members, to believe that Defendant had disclosed all the material risks associated with the Products.

49. Plaintiffs relied on Defendant's representations to conclude that the Products did not contain or risk containing a dangerous substance, including benzene.

50. Any reasonable consumer would find the presence of dangerous substances, such as benzene, to be significant and material. Plaintiffs and Class Members would not have

purchased the Products had the hazardous nature of the Products been known or, at minimum, would have paid less for the Products.

51. As alleged herein, Defendant has violated the FDCA, the IL FDCA, and the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA") in connection with its misconduct, misrepresentations and omissions surrounding the presence or risk of presence of benzene in the Products.

### E. Plaintiffs' Purchases

52. Plaintiff, Wioletta Smoter, purchased and used OXY® Advanced Care™ Rapid Spot Treatment multiple times during the Class Period.

53. Plaintiff, Joanna Taraszka, purchased and used OXY® Advanced Care™ Soothing Cream Acne Cleanser multiple times during the Class Period.

54. Nowhere on the Products' packaging or marketing materials did Defendant disclose that the Products contained benzene or risked containing benzene at the time of Plaintiffs' purchases. Plaintiffs relied on Defendant's representations of product safety and omissions of the existence or potential existence of benzene in the Products when making their purchases.

55. If Plaintiffs had been aware of the existence of benzene in the Products, they would not have purchased the Products or would have paid significantly less for the Products.

56. Defendant intended that Plaintiffs and each of the other Illinois Subclass Members would reasonably rely upon the misrepresentations, misleading characterizations, and material omissions concerning the true nature of the Products.

57. As a result of Defendant's actions, Plaintiffs have incurred actual economic damages.

## IV. CLASS ALLEGATIONS

58. Plaintiffs bring this action individually and as representatives of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following defined Classes:

> **NATIONAL CLASS:** All persons in the United States who purchased the Products for personal or household use within any applicable limitations period ("National Class")
>
> **ILLINOIS SUBCLASS**: All persons in the State of Illinois who purchased the Products for personal or household use within any applicable limitations period ("Illinois Subclass")

59. Members of the classes described above are referred to as "Class Members" or members of the "Classes."

60. The following are excluded from the Classes: (1) any judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

61. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs' claims can be proven on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

62. **Numerosity - Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that individual joinder of all Class Members is impracticable. On

information and belief, Class Members number in the thousands. The precise number and identities of members of the Classes are presently unknown to Plaintiffs but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

63. **Commonality and Predominance - Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**. Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting individual members of the Classes. These common questions of law or fact include, but are not limited to:

   a. Whether, at the time of purchase, the Products contained benzene or were at risk of containing benzene;

   b. Whether Defendant knew or should have known the Products contained benzene or were at risk of containing benzene;

   c. Whether Defendant failed to disclose that the Products contained benzene or were at risk of containing benzene;

   d. Whether the presence of benzene in the Products renders the Products adulterated;

   e. Whether a reasonable consumer would consider the presence or risk of presence of benzene to be material;

   f. Whether the Products' marketing, advertising, packaging, and labeling are deceptive;

   g. Whether the Products' marketing, advertising, packaging, and labeling are unfair;

   h. Whether Defendant is liable to Plaintiffs and the Classes for unjust enrichment; and

   i. Whether Plaintiff and the Classes have sustained monetary loss and the measure of that loss.

64. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs on behalf of the other Class Members. Similar or identical

statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

65. **Typicality - Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class Members because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each Class Member were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

66. **Adequacy of Representation - Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate representatives of the Classes because Plaintiffs are members of the Classes and Plaintiffs' interests do not conflict with the interests of the Class Members Plaintiffs seek to represent. Plaintiffs have also retained counsel competent and experienced in complex commercial and class action litigation. Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously for the benefit of all Class Members. Accordingly, the interests of the Class Members will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

67. **Superiority - Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a

potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**COUNT I:**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**815 ILCS 505/1, *et seq.***
**On behalf of the Illinois Subclass**

68. Plaintiffs, on behalf of themselves and all others similarly situated, repeat and re-allege paragraphs 1 through 67 as if fully set forth herein.

69. At all times relevant to this complaint, the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq*. was in effect.

70. ICFA, among other things, prohibits unfair or deceptive acts or practices, including, but not limited to, "misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact," or "the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' (815 ILCS 505/2)," such as "conduct which . . . creates a likelihood of confusion or misunderstanding." 815 ILCS 510/2(12).

71. At all times relevant hereto, Defendant was engaged in trade or commerce as defined under ICFA, 815 ILCS 505/1(f).

72. Defendant engaged in deceptive acts and practices and conduct likely to cause confusion and misunderstanding when it manufactured, distributed and sold unauthorized, adulterated products, and engaged in misleading and deceptive advertising, marketing and

17

labeling that represented that the Products were safe and omitting that the Products contained benzene or risked containing benzene.

73. Defendant was aware that Plaintiffs and Illinois Subclass members reasonably believed that the Products were safe for personal use and did not contain or risk containing any dangerous substances, including benzene. However, the Products are not safe, as they contain or risk containing benzene.

74. Defendant intended that Plaintiffs and each of the other Illinois Subclass Members would reasonably rely upon the misrepresentations and omissions concerning the true nature of the Products, because Plaintiffs and Subclass members would not have purchased the Products has they been aware that the Products contained or risked containing benzene, a known carcinogen.

75. Defendant's misrepresentations, concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiffs and each of the other Illinois Subclass Members to be misled and deceived about the true nature of the Products.

76. Defendant's conduct was unfair in that it violated public policy (*e.g.*, federal law and regulations and Illinois law), was so oppressive that consumers had little choice but to submit, and was substantially injurious to consumers, as Defendants' Products subjected consumers to substantial, undisclosed health hazards in violation of law.

77. Plaintiffs and the other Illinois Subclass Members reasonably relied upon Defendant's representations that the Products were safe for personal use, and omissions of benzene from the Products' ingredients, to conclude that the Products did not contain or risk containing a dangerous substance, including benzene.

18

78. As a direct and proximate result of the unfair and deceptive acts and practices alleged herein, Plaintiffs and Subclass Members have been damaged in that they have paid more for the Products than they would have had they been aware of their hazardous attributes. Had they been aware of the true nature of the Products, Plaintiffs and Class Members either would have paid less for the Products or would not have purchased them at all.

79. Plaintiffs and the Illinois Subclass Members are therefore entitled to relief, including actual damages, punitive damages, costs and attorneys' fees, under section 815 ILCS 505/10a of ICFA, in an amount to be determined at trial.

**COUNT II**
**UNJUST ENRICHMENT**
**On Behalf of the Classes**

80. Plaintiffs, on behalf of themselves and all others similarly situated, repeat and re-allege paragraphs 1 through 67 as if fully set forth herein.

81. Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendant.

82. By virtue of having charged Plaintiffs and Class Members in excess of the value of its adulterated and misbranded Products, Defendant unjustly retained a benefit to the detriment of Plaintiffs and Class Members. For the reasons set forth herein, Defendant's retention of this benefit violates fundamental principles of justice, equity, and good conscience.

83. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been damaged in that they have paid money to Defendant in excess of the value of Defendants' hazardous Products.

84. Accordingly, based on Defendant's conduct, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court enter an Order:

a. Certifying this action as a class action as provided by Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class Representatives for the Classes, and appointing the undersigned as Class Counsel for the Classes;

b. Adjudging that Defendant's conduct violates the causes of action referenced herein;

c. Finding in favor of Plaintiffs and the Classes on all counts herein;

d. Awarding compensatory and punitive damages arising from Defendant's wrongful conduct;

e. Awarding reasonable attorneys' fees and costs and expenses incurred in the course of prosecuting this action; and

f. Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all triable issues.

Dated: May 20, 2024

Respectfully submitted,

*/s/ Martin W. Jaszczuk*
Martin W. Jaszczuk
Margaret M. Schuchardt
JASZCZUK P.C.
311 South Wacker Drive, Suite 2150
Chicago, Illinois 60606
Tel: (312) 442-0509
mjaszczuk@jaszczuk.com
mschuchardt@jaszczuk.com
Firm No. 61115

Matthew Peterson
Consumer Law Advocate, PLLC
230 E. Ohio St., Suite 410
Chicago, IL 60611
Tel: (815) 999-9130
mtp@lawsforconsumers.com
ARDC No. 6321290