**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WIOLETTA SMOTER, *et al.*, *individually* *and on behalf of all others similarly situated*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:24-cv-04155 |
| v. | ) ) ) | Judge Jeremy C. Daniel |
| THE MENTHOLATUM COMPANY, INC., | ) | **ORAL ARGUMENT REQUESTED** |
| Defendant. | ) ) ) | |

**DEFENDANT THE MENTHOLATUM COMPANY'S**
**<u>MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

ORAL ARGUMENT REQUESTED ..................................................................................... 1

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................. 3

I.     THE COMPLAINT ................................................................................................... 3

II.    THE VALISURE REPORT ....................................................................................... 4

DISCUSSION ..................................................................................................................... 5

I.     PLAINTIFFS LACK ARTICLE III STANDING TO PURSUE THEIR
CLAIMS ................................................................................................................... 5

     A.    Legal Standard Under Rule 12(b)(1) .......................................................... 5

     B.    Plaintiffs Fail to Allege Any Facts to Plausibly Suggest an Injury-
in-Fact .......................................................................................................... 5

II.    PLAINTIFFS FAIL TO STATE ANY CLAIMS FOR RELIEF ............................ 7

     A.    Legal Standard Under Rule 12(b)(6) .......................................................... 7

     B.    Plaintiffs' Claims Are Preempted ............................................................... 8

          i.    *The FDA Monograph controls and permits the inclusion of
10% BPO* .......................................................................................... 8

          ii.    *Plaintiffs' labeling omission claims are preempted* ...................... 9

          iii.   *Plaintiffs cannot escape preemption by mere reference to
the cGMPs* ...................................................................................... 12

     C.    Plaintiffs' Claims Otherwise Fail as a Matter of Law ............................. 14

          i.    *Plaintiffs fail to state an ICFA claim based in
misrepresentation* ........................................................................... 14

          ii.    *Plaintiffs fail to state an ICFA claim based in omission* ............ 16

          iii.   *Plaintiffs' ICFA claims are barred under the ICFA safe
harbor* ............................................................................................. 18

          iv.   *Plaintiffs' unjust enrichment claims fail along with their
ICFA claims* ................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aqua Dots Prod. Liab. Litig.*,
    654 F.3d 748 (7th Cir. 2011) .................................................................6

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................7, 8

*Barnes v. Unilever*,
    2023 WL 2456385 (N.D. Ill. Mar. 11, 2023) .........................................13

*Benson v. Fannie May Confections Brand, Inc.,*
    944 F.3d 639, 645 (7th Cir. 2019) ........................................................10

*Bober v. Glaxo Wellcome PLC*, |
    246 F.3d 934 (7th Cir. 2001) ................................................................18

*Bojko v. Pierre Fabre USA Inc.*,
    2023 WL 4204663 (N.D. Ill. June 27, 2023) .........................................17

*Bowen v. Energizer Holdings, Inc.*,
    No.23-55116, 2024 WL 4352496 (9th Cir. Oct. 1, 2024) ........................7

*Castillo v. Unilever United States, Inc.*,
    2022 WL 17976163, at *3 (N.D. Ill. Dec. 28, 2022 ........................15, 16

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
    761 F.3d 732, 737 (7th Cir. 2014) ........................................................14

*Darne v. Ford Motor Co.*,
    2017 WL 3836586, at *10 (N.D. Ill. Sept. 1, 2017) ..............................16

*Elward v. Electrolux Home Prod., Inc.*,
    214 F. Supp. 3d 701, 709 (N.D. Ill. 2016) ............................................18

*Guajardo v. Skechers USA, Inc.*,
    2021 WL 4302532, at *3 (C.D. Ill. Sept. 21, 2021) ..............................16

*Haywood v. Massage Envy Franchising*,
    887 F.3d 329, 333 (7th Cir. 2018) ........................................................14

*Harris v. Topco Assocs., LLC*,
    538 F. Supp. 3d 826, 830-31 (N.D. Ill. 2021) .......................................10

*Hillen v. Blistex, Inc.*,
  2017 WL 2868997 (N.D. Ill. July 5, 2017) ...........................................................................18

*Howard v. Alchemee LLC*,
  No. 24-01834, 2024 WL 4272931 (C.D. Cal. Sept. 19, 2024) ........................................ *passim*

*Huertas v. Bayer U.S., LLC*,
  No. 21-cv-20021 2023 WL 3773139 (D.N.J. May 23, 2023)....................................................6

*Ibarrola v. Kind, LLC*,
  83 F. Supp. 3d 751 (N.D. Ill. 2015) ....................................................................................18

*Kell v. Lily's Sweets, LLC*,
  No. 23-cv-0147, 2024 WL 1116651 (S.D.N.Y. Mar. 13, 2024)...............................................6

*In re Recalled Abbott Infant Formula Prod. Liab. Litig.*,
  97 F.4th 525 (7th Cir. 2024) ........................................................................................5, 6, 8

*Miller v. William Chevrolet/GEO, Inc.*,
  326 Ill. App. 3d 642, 658 (1st Dist. 2001) ............................................................................17

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
  710 F.3d 71, 75 (2d Cir. 2013) ..............................................................................................8

*Nelson v. John Paul Mitchell Systems*,
  2024 WL 4265198, at *1 (N.D. Ill. Sept. 23, 2024) ...............................................................6

*Novotney v. Walgreen Co.*,
  683 F. Supp. 3d 785, 789 (N.D. Ill. 2023) ..................................................................8, 10, 12

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
  631 F.3d 436, 447 (7th Cir. 2011) .......................................................................................18

*Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*,
  782 F.3d 922, 928 (7th Cir. 2015) .......................................................................................10

*Skylar Williams v. Galderma Lab'ys, L.P.*,
  No. 24 CV 2222, 2024 WL 4213220 (N.D. Ill. Sept. 17, 2024).................................... *passim*

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)...............................................................................................................5

*Thulin v. Shopko Stores Operating Co., LLC*,
  771 F.3d 994 (7th Cir. 2014) .................................................................................................7

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)...............................................................................................................5

*Wisconsin Cent., Ltd. v. Shannon*,
  539 F.3d 751, 762 (7th Cir. 2008) ........................................................................9

**Other Authorities**

75 FR 9767-01 .........................................................................................................9

21 C.F.R. § 333.310 ........................................................................................ *passim*

21 C.F.R. § 333.350 ........................................................................................ *passim*

21 C.F.R. § 201.66 .................................................................................................11

21 C.F.R. § 210.3 ...................................................................................................11

FRCP Rule 8 ............................................................................................................5

FRCP Rule 12(b)(1) .................................................................................................5

FRCP Rule 12(b)(6) .................................................................................................7

## ORAL ARGUMENT REQUESTED

The Mentholatum Company. Inc. ("Mentholatum") respectfully requests oral argument on this Motion, which raises complex issues of standing and preemption, the latter of which has already resulted in conflicting trial court orders, detailed further herein. Mentholatum believes oral argument will aid in the presentation and analysis of these key issues.

## PRELIMINARY STATEMENT

Plaintiffs Wioletta Smoter and Joana Taraszka bring this putative consumer fraud class action regarding two over-the-counter acne products (Oxy® Advanced Care Rapid Spot Treatment and Oxy® Advanced Care Soothing Cream Acne Cleanser, the "Products"). Fundamentally, Plaintiffs contend benzoyl peroxide ("BPO")—an active ingredient specifically approved by the Food and Drug Administration ("FDA") for the Products—should be banned. Plaintiffs assert, based solely on the work of a biased non-party, that BPO can in certain circumstances degrade into benzene, and thus Mentholatum engaged in deceptive practices causing economic harm.

It is critical to frame what this case *is*, and what it *is not*. The Products comply with the relevant FDA Monograph for over-the-counter ("OTC") acne medication, which permits BPO up to 10%. *See, e.g.*, 21 C.F.R. § 333.310; 21 C.F.R. § 333.350. Plaintiffs <u>do not</u> contend otherwise. This case stems from a citizens' petition presented to the FDA by a non-party, Valisure LLC ("Valisure"). Valisure—and Plaintiffs—assert BPO is "fundamentally unstable" and should be removed from the market. This <u>is not</u> a contamination case. This <u>is not</u> a case concerning defective manufacturing techniques or processes. Plaintiffs assert that BPO is *itself* an inherent problem. This case <u>is</u> fundamentally a challenge to the FDA's approval of BPO, and thus must be dismissed.

Plaintiffs' claims suffer from three defects. <u>First</u>, Plaintiffs lack standing as they have no injury in fact. Plaintiffs assert the Products contain or may contain benzene and thus are worth less (or worthless). Plaintiffs, however, fail to support the presence of benzene in the Products.

They have not tested the Products. Plaintiffs have not alleged that they purchased from the same lot that Valisure tested, or even from the same product line. Plaintiffs have not alleged the products they purchased were put through the same conditions Valisure used. Plaintiffs got what they paid for. They cannot merely point to the Valisure report and thereby claim an injury in fact.

Second, Plaintiffs' claims are preempted by the Food, Drug and Cosmetic Act ("FDCA"), as Plaintiffs attempt to impose obligations on Mentholatum in addition to and inconsistent with those required by federal law. At bottom, Plaintiffs' claims are predicated on the assertion that the Products do not disclose that they may include (or, rather, degrade to form) benzene. But the Products comply with the FDA Monograph, which does not require any disclosure. Therefore, any claim predicated on alleged labeling omissions must be preempted. *See Skylar Williams v. Galderma Lab'ys, L.P.*, 2024 WL 4213220, at *3 (N.D. Ill. Sept. 17, 2024).

Plaintiffs cannot avoid preemption by referencing the FDA Current Good Manufacturing Practices ("cGMPs"). This is not a deficient manufacturing case. Rather, Plaintiffs allege that BPO is "fundamentally unstable" and that "benzene in [Products] is coming from the [BPO] itself." This case is an attack on whether BPO should be an approved ingredient—a question the FDA already answered. Plaintiff essentially claim that Mentholatum is selling an inherently adulterated product due to the alleged degradation of BPO. This theory "is inconsistent with FDA's approval of BPO . . . ." *Howard v. Alchemee LLC*, 2024 WL 4272931, at *9 (C.D. Cal. Sept. 19, 2024). Plaintiffs may not use this Court to collaterally attack the FDA's approval of BPO.

Third, Plaintiffs' ICFA and unjust enrichment claims fall on their own. Plaintiffs do not plausibly allege any actionable misrepresentation, failing to identify any specific representation they saw. Nor do Plaintiffs allege any specific communication containing an actionable omission.

For these reasons and as detailed below, this case should be dismissed with prejudice.

**BACKGROUND**

## I.    THE COMPLAINT

Plaintiffs' Complaint is straightforward.  Plaintiff Smoter claims to have purchased and used OXY® Advanced Care Rapid Spot Treatment, and Plaintiff Taraszka claims to have purchased and used OXY® Advanced Care Soothing Cream Acne Cleanser.  (*See* Dkt. 1 ¶¶ 52, 53.)  Plaintiffs allege the Products contain 10% BPO.  (*Id.* ¶ 32.)  Plaintiffs do not allege when or where they made these purchases; that they tested the Products; that they were harmed by the Products; or that they detected or suffered from any level of benzene whatsoever in the Products.  Nor do Plaintiffs allege *any* specific representations they saw and relied upon, other than the existence of the Products themselves.  (*See id.* ¶¶ 52-54.)

Instead, Plaintiffs rely solely on Valisure's report.  Plaintiffs state that on March 6, 2024, Valisure released a study of BPO acne products, testing myriad products, including an OXY® product.[1]  Plaintiffs adopt as alleged fact certain findings they hope will anchor this case:

- "Valisure's study indicated that currently formulated BPO medications are **fundamentally unstable** and can generate unacceptably high levels of benzene **when handled or stored at higher temperatures** . . . ."  (*Id.* ¶ 28, emphasis added.)

- "Valisure is requesting market withdrawal of BPO-containing products."  (*Id.* ¶ 29.)

- "Valisure has previously identified cosmetics and drugs that were inadvertently contaminated with benzene.  **In contrast here**, Valisure stated: 'This discovery of benzoyl peroxide's fundamental instability and formation of benzene is substantially different than Valisure's previous findings of benzene in [other consumer

---

[1]    The Valisure Report labeled the products that it purportedly tested by BPO percentage, brand name, product type and Universal Product Code ("UPC") number. *See* Valisure Petition on Benzene in Benzoyl Peroxide Drug Products at p. 16, available at https://cdn.prod.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf (last visited October 7, 2024).  The Valisure Report purportedly tested an OXY® product identified by UPC number 310742026726.  *See id.* at Figure 4C.  Plaintiffs **do not** allege purchasing this product.

products]. The benzene we found in sunscreens and other consumer products were impurities that came from contaminated ingredients; however, **the benzene in benzoyl peroxide products is coming from the benzoyl peroxide itself** . . . ." (*Id.* ¶ 31, emphasis added.)

Plaintiffs' Complaint thus rests on the contention that BPO—an FDA-approved ingredient—constitutes *per se* adulteration of the Products and seeks the removal of BPO from the market.

While Plaintiffs reference the FDA's cGMPs, the thrust of their Complaint makes clear this <u>is not</u> a manufacturing processes case. Plaintiffs contend that Mentholatum failed to comply with the cGMPs because (i) benzene could have been avoided by omitting BPO and (ii) additional ingredients could have been added to reduce the potential for the presence of benzene. (*Id.* ¶ 39.)

Plaintiffs claim Mentholatum violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA")—alleging Mentholatum deceptively marketing and sold the Products—and was unjustly enriched. They allege economic harm only. (*Id.* ¶¶ 78, 83.) They seek to represent a nationwide class and Illinois subclass of purchasers of the Products. (*Id.* ¶ 58.)

## II.    THE VALISURE REPORT

Valisure, a self-styled independent laboratory that routinely sparks consumer class actions, submitted to the FDA a citizen petition claiming BPO acne products degrade into benzene when exposed to prolonged, high heat. This petition is integrated into the Complaint as its sole support.

Valisure's testing methodology involved subjecting its limited sampling of BPO products, for weeks at a time, to "above-ambient temperatures, specifically, 37°C (98.6°F), 50°C (122°F), and 70°C (158°F)." *See* Valisure Petition on Benzene in Benzoyl Peroxide Drug Products at p. 1, available at https://cdn.prod.website-files.com/6215052733f8bb8fea016220/65e8560962ed 23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Pero xide%20Drug%20Products.pdf (last visited October 7, 2024). The results of Valisure's testing are pictured at Figure 4 of the Valisure Report. *See id.* at 16. Valisure tested "specific batches" of

various BPO products and, as shown in Figure 4, the results are labeled by the BPO percentage, brand name, product type and the UPC number." *Id.* Benzene was not detected in all of the BPO acne products Valisure tested, even after being subjected to these high temperatures for weeks at a time. *Id.* at 1, 15. Nonetheless, Valisure called for a recall of all BPO acne products on the market, based on the risk they "could produce substantial amounts of benzene *when stored at above-ambient temperatures . . . ." Id.* at 1 (emphasis added). The FDA has not acted on Valisure's petition, but consumer class actions (like this one) predictably followed in droves.[2]

## DISCUSSION

### I. PLAINTIFFS LACK ARTICLE III STANDING TO PURSUE THEIR CLAIMS.

#### A. Legal Standard Under Rule 12(b)(1)

To sustain Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). An injury must be "real" and "not abstract," and must be particularized. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-40 (2016) (internal quotations omitted). Facts in support of standing must also satisfy Rule 8. *See id.* at 338. Standing challenges can be facial or factual. *See In re Recalled Abbott Infant Formula Prod. Liab. Litig.*, 97 F.4th 525, 528 (7th Cir. 2024). Mentholatum raises here a facial challenge.

#### B. Plaintiffs Fail to Allege Any Facts to Plausibly Suggest an Injury-in-Fact.

Plaintiffs claim only economic harm; namely, if they knew of benzene in the Products, they would not have paid for, or would have paid less for, the Products. (Dkt. 1 ¶¶ 55, 57, 78, 83.) Plaintiffs' injuries are hypothetical. Plaintiffs fail to allege the presence of benzene in the Products.

---

[2]   The FDA's review and history of evaluating BPO acne products counsels in favor of primary jurisdiction. Mentholatum reserves the right to raise the primary jurisdiction doctrine.

The Seventh Circuit recently provided instructive guidance on hypothetical injury in *In re Recalled Abbott Infant Formula Prod. Liab. Litig.*, (hereinafter "*Abbott*"). In *Abbott*, a putative class pursued economic-injury claims after a voluntary recall of infant formula produced at an unsanitary facility. 97 F.4th 525, 527 (7th Cir. 2024). The plaintiffs argued they would have paid less for the product if they knew of the risk of contamination. *Id*. at 528. The Court found standing lacking, holding the injury was "hypothetical or conjectural" and "not particularized because they do not allege that any of the products they purchased were contaminated." *Id.* at 529.[3] So too here.

By way of further example, in *Nelson v. John Paul Mitchell Systems*, Judge Coleman evaluated a case brought by purchasers of a specific type of dry shampoo allegedly contaminated with benzene. *See* 2024 WL 4265198, at *1 (N.D. Ill. Sept. 23, 2024). The plaintiffs alleged (in yet another Valisure case) that Valisure tested and found benzene in three lots of the product at issue. *Id.* at *3. The court found no standing, holding:

> Here, Plaintiffs do not allege that the Product that they purchased contained benzene. Plaintiffs argue that because Valisure's test of three lots of the Product revealed the presence of benzene, there is a risk that all the lots of the Product contained benzene, and therefore the Product that they purchased did contain or likely contained benzene. . . . [A]bsent allegations that the Product they purchased was from one of the tested lots, these allegations are not particularized to show that Plaintiffs suffered more than an abstract risk of similar financial injury. For these reasons, Plaintiffs lack standing to seek damages for their claims.

*Id.* at *3. Courts reaching the same conclusion are legion.[4]

---

[3]    The Court distinguished an earlier Seventh Circuit decision *In re Aqua Dots Prod. Liab. Litig*., 654 F.3d 748 (7th Cir. 2011), which the Court noted involved a product in which there was a universal defect, not merely the potential risk of harm or a defect. *See Abbott*, 97 F. 4th at 530.

[4]    *See Huertas v. Bayer U.S., LLC*, No. 21-cv-20021 2023 WL 3773139, at *10 (D.N.J. May 23, 2023) ("Plaintiffs are unable to establish a plausible inference that every Product at issue, including those purchased by Plaintiffs, also contained benzene and excessive levels of such."); *Kell v. Lily's Sweets, LLC*, No. 23-cv-0147, 2024 WL 1116651, at *4 (S.D.N.Y. Mar. 13, 2024)

Plaintiffs rely solely on the Valisure report. (Dkt. 1 ¶¶ 26-32.) Plaintiffs claim "Valisure tested dozens" of BPO products, "including OXY products containing 10% BPO." (*Id.* ¶¶ 28, 32.) Plaintiffs do not identify the product tested or the results. It must also be recalled that Valisure put products through prolonged and high heat. *See* Valisure Report at 1, 15-19; *compare Bowen v. Energizer Holdings, Inc.*, 2024 WL 4352496, at *2 (9th Cir. Oct. 1, 2024) (finding standing where the plaintiff did her own testing and cited to a third-party test of the same product).

Plaintiffs provide no allegations that (i) the Products they purchased contained benzene, (ii) they purchased a product from the same lot Valisure tested, (iii) they validated Valisure's work, (iv) their Products were put through the same conditions Valisure used to allegedly cause BPO degradation or (v) Valisure tested *the same product lines* Plaintiffs purchased. Plaintiffs provide no basis for a concrete and particularized injury. At best, Plaintiffs contend Valisure tested *an* OXY® product. Plaintiffs provide no thread connecting Valisure's report (even assuming its validity) and even the potential presence of benzene in the Products they purchased and used.

## II.     PLAINTIFFS FAIL TO STATE ANY CLAIMS FOR RELIEF.

### A.     Legal Standard Under Rule 12(b)(6)

Under Rule 12(b)(6), courts must dismiss a complaint where it does not "provide enough factual information to 'state a claim to relief that is plausible on its face' and 'raise a right to relief above the speculative level.'" *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 997 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). In other words, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v.*

("The [third party source] does not supply a factual basis upon which Kell can plausibly allege that she purchased chocolate bars contaminated with lead. . . . It would be impermissible conjecture to extrapolate those findings to every [product at issue] ever sold, or to the specific Products purchased by Kell, without some specific factual basis to do so.").

*Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation and citation omitted). Courts disregard conclusory allegations and legal conclusions because "a pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). In evaluating 12(b)(6) motions, the Supreme Court has urged courts "to draw on [their] judicial experience and common sense." *Id*.

### B. Plaintiffs' Claims Are Preempted.

Even if Plaintiffs had standing—which they may attempt to do by arguing that BPO is itself a "universal defect," *Abbott*, 97 F.4th at 529—Plaintiffs' claims are preempted. Their causes of action stem not from an alleged contamination or defect in manufacturing, but a contention that an FDA-approved ingredient, BPO, in Monograph-compliant Products requires added disclosures. The propriety of BPO lies solely and exclusively the purview of the FDA.

#### i. *The FDA Monograph controls and permits the inclusion of 10% BPO.*

The FDA regulates over-the-counter ("OTC") acne medications through what is known as a drug monograph. *See* 21 C.F.R. § 330.310. The Second Circuit described the process as follows:

> Commenced in 1972, the OTC Drug Review established FDA's "monograph" system for regulating over-the-counter drugs. *See* 21 C.F.R. § 330.10; 37 Fed. Reg. 9464 (May 11, 1972). While FDA must generally approve drugs as GRAS/E [generally recognized as safe and effective] individually, the monograph system allows manufacturers to bypass individualized review. *See* 21 U.S.C. § 355; 21 C.F.R. § 330.10. Under this system, FDA issues a detailed regulation—a "monograph"—for each therapeutic class of OTC drug products. Like a recipe, each monograph sets out the FDA-approved active ingredients for a given therapeutic class of OTC drugs and provides the conditions under which each active ingredient is GRAS/E. FDA excludes from its monographs any active ingredients or uses of active ingredients that it has determined either not to be GRAS/E or for which there is insufficient data to confirm whether they are GRAS/E.

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 75 (2d Cir. 2013); *see also Novotney v. Walgreen Co.*, 683 F. Supp. 3d 785, 789 (N.D. Ill. 2023) (same).

In 2010, the FDA issued a final rule "conclud[ing] that benzoyl peroxide, in concentrations of 2.5 to 10 percent, is GRASE for the OTC topical treatment of acne," thereby adding BPO as an approved active ingredient under its acne Monograph.[5]  *See* Classification of Benzoyl Peroxide as Safe and Effective and Revision of Labeling to Drug Facts Format; Topical Acne Drug Products for Over-The-Counter Human Use; Final Rule, 75 FR 9767-01 at 9769.  The FDA set forth "conditions under which OTC drug products containing benzoyl peroxide for the topical treatment of acne are GRASE and not misbranded."  *Id.* at 9768.  The FDA determined that studies "adequately exclude[d] the possibility that benzoyl peroxide is a carcinogen with a short or long latency period."  *Id.* at 9770.  In sum, "a drug that complies with all monograph requirements is not misbranded."  *Williams*, 2024 WL 4213220, at *3.

The FDA *specifically permits* OTC acne medications to contain BPO up to 10%, and sets forth specific labeling requirements for such products.  *See, e.g.*, 21 C.F.R. § 333.310; 21 C.F.R. § 333.350; *see also Howard*, 2024 WL 4272931, at *6 ("The monograph expressly permits BPO to be an active ingredient in these products (in an amount from 2.5 to 10 percent).").  The most recent monograph was adopted in 2020 and again allows for BPO up to 10%.  *See* FDA Over-the-Counter Monograph M006: Topical Acne Drug Products for Over-the-Counter Human Use, available at https://www.accessdata.fda.gov/drugsatfda_docs/omuf/OTC%20Monograph_M006-Topical%20Acne%20drug%20products%20for%20OTC%20Human%20Use%2011.23.2021.pdf

ii.     ***Plaintiffs' labeling omission claims are preempted.***

Preemption stems from the Constitution's Supremacy Clause.  *See, e.g.*, *Wisconsin Cent., Ltd. v. Shannon*, 539 F.3d 751, 762 (7th Cir. 2008).  While preemption is an affirmative defense,

---

[5]     While Plaintiffs allege "the connection between BPO and Benzene has been documented since at least 1994," (Dkt. 1 ¶ 24), the FDA's approval of BPO occurred well after this alleged science around degradation allegedly was "known within scientific literature" (*Id.* ¶ 40.)

preemption can be evaluated at the 12(b)(6) stage "where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015); *see also Novotney*, 683 F. Supp. 3d at 788. Plaintiffs have pleaded themselves out of court, because preemption is patently clear from the Complaint's allegations when read alongside the pertinent regulations.

The FDCA has a broad preemptive effect. *See* 21 U.S.C. § 379r(a). In short, "states are prohibited from enforcing legislation that would impose requirements on drug manufacturers that are 'different from . . . in addition to, or . . . otherwise not identical with, a requirement under the' FDCA." *Williams,* 2024 WL 4213220 at *2 (citing 21 U.S.C. § 379r(a)); *see also Benson v. Fannie May Confections Brand, Inc.,* 944 F.3d 639, 645 (7th Cir. 2019) (finding that the right to bring a private right of action pursuant to state-law causes of action "is tightly circumscribed by the FDCA's express preemption of state-law theories that impose requirements 'not identical' to its own requirements"). The term "'requirements' sweeps broadly." *Harris v. Topco Assocs., LLC,* 538 F. Supp. 3d 826, 830-31 (N.D. Ill. 2021) (internal quotations and citation omitted).

Plaintiffs do not allege the Products fail to comply with the Monograph or fail to meet any FDA-required disclosure. Plaintiffs' theory relies on alleged omissions from Monograph-compliant labels. Specifically, Plaintiffs allege Mentholatum committed actionable omissions by failing to list benzene as an ingredient in the Products and by failing to warn consumers that the BPO could degrade into benzene. (*See* Dkt. 1 ¶¶ 4, 33, 47, 54.) And they allege, contradicting the Monograph, that BPO is unacceptable because it can degrade into benzene. (*Id.* ¶ 31.) This theory is preempted, as Plaintiffs seek to impose requirements going beyond what the FDA requires.

The Monograph sets forth in detail the exact warnings that must be on the labels of OTC acne drug products, including warnings that are only necessary for the subset containing BPO. *See*

21 C.F.R. § 333.350(c)(4), (d)(2). Those warnings do not include mention of benzene or its risks. Given the FDA has specifically identified the warnings that must be provided when an acne drug contains BPO, Plaintiffs' contention that the presence of BPO requires a warning about benzene seeks to impose an additional labeling requirement that goes beyond the FDA's requirements. Courts evaluating this issue in the BPO context have agreed. *See, e.g.*, *Williams*, 2024 WL 4213220, at *3 ("Williams's allegation that Galderma should have warned about the presence of benzene on Differin's label is therefore preempted because it would be an 'addition' not required by federal law."); *Howard*, 2024 WL 4272931, at *8 ("Plaintiffs' contention that the presence of BPO requires a warning about benzene seeks to impose an additional labeling requirement that is not identical to the FDA's requirements and is therefore preempted by § 379r(a).")

Nor can Plaintiffs force Mentholatum to list benzene among the Products' ingredients. Federal regulations require Mentholatum to list only active and inactive ingredients. *See* 21 C.F.R. § 201.66(c); *Williams,* 2024 4213220 at *4. An active ingredient is "any component that is intended to furnish pharmacological activity . . . ." *Id.* § 201.66(b)(2). An inactive ingredient is "any component other than an active ingredient." *Id.* § 201.66(b)(8). And a "component," in turn, is any ingredient "intended for use in the manufacture of a drug product . . . ." 21 C.F.R. § 210.3(b)(3). By Plaintiffs' own allegations, benzene is not an active or inactive "ingredient," because it is never intended to be included in the Products. Nor does it allegedly appear in products because of faulty manufacturing. Instead, Plaintiffs specifically allege that BPO, the actual ingredient, "degrades over time into benzene." (*See* Dkt. 1 ¶ 3.) Plaintiffs' attempt to force Mentholatum to rewrite its label to say more than the Monograph requires is thus preempted. *See, e.g.*, *Williams*, 2024 WL 4213220, at *4; *Howard*, 2024 WL 4272931, at *8.

11

In addition to having been rejected in *Williams* and *Howard*, Plaintiffs' theory is similar to the theory disregarded in *Novotney v. Walgreen*, wherein a plaintiff asserted hydrogen peroxide labeling was deceptive because the plaintiff believed hydrogen peroxide was not effective. 683 F. Supp. 3d at 790. The court found the claim preempted because "[t]he content of the product's label as it relates to its safety or effectiveness is a matter of federal law, and by claiming that some other terminology is necessary to ensure that the label is not misleading, plaintiff impermissibly" sought to impose requirements different from or in addition to the FDCA. *Id.* at 792.

Nor can Plaintiffs contend that including BPO renders the Products adulterated or misbranded. (*See* Dkt. 1 ¶¶ 4, 5, 19, 72.) It is clear that "a drug that complies with all monograph requirements is not misbranded," and Plaintiffs cannot contend otherwise. *Williams*, 2024 WL 4213220, at \*3; *see also Howard*, 2024 WL 4272931, at \*9 (disregarding contention that plaintiffs could pursue parallel claims relating to adulterated drugs). Plaintiffs are impermissibly asking the Court to second-guess the FDA and impose requirements different from and in addition to what the Monograph requires. Their labeling omission claims are preempted.

### iii. *Plaintiffs cannot escape preemption by mere reference to the cGMPs.*

Plaintiffs cannot avoid preemption simply by pointing to the cGMPs. Plaintiffs include allegations summarizing the FDA's cGMPs, and assert Mentholatum must have failed to comply with the cGMPs because of the alleged presence of benzene. (*See* Dkt. 1 ¶¶ 34-41.) The problem here, though, is Plaintiffs are in reality challenging the inclusion of BPO as an active ingredient.

This is not a case about contamination, adulteration, or manufacturing practices. Plaintiffs' claims are based on the premise that "currently formulated BPO medications are fundamentally unstable and can generate unacceptably high levels of benzene when handled or stored at higher temperatures that the products may be exposed to during handling by consumers." (*Id*. ¶ 28) Plaintiffs note that Valisure is seeking "market withdrawal of BPO-containing products." (*Id.* ¶

29.)  Plaintiffs specifically allege that this ***is not*** a case of a contaminated ingredient, but rather that "benzene in [BPO] products is coming from the [BPO] itself."  (*Id.* ¶ 31); *Howard*, 2024 WL 4272931, at *7 (recognizing that what plaintiffs were actually seeking was a ban on the product).

Mentholatum recognizes that parallel state claims on alleged cGMP violations sometimes proceed in this Circuit, and also recognizes that in *Williams*, the cGMP-related allegations (almost as conclusory as the ones here) were not found to be preempted.  *See Williams*, 2024 WL 4213220, at *5.  But Mentholatum respectfully points out that the *Williams* court misunderstood the BPO issue at hand.  The *Williams* court relied on *Barnes v. Unilever*, 2023 WL 2456385 (N.D. Ill. Mar. 11, 2023), a case involving benzene ***contamination*** of an aerosol spray.  This is not a contamination case.  A California court recognized this key distinction in *Howard v. Alchemee*, analyzing *Williams* and instead concluding, "Plaintiffs have not alleged that the 'presence of benzene in [Proactiv] stems' from the manufacturing process. . . .  On the contrary, they allege that the cause is the inevitable degradation of BPO."  *Howard*, 2024 WL 4272931, at *9 n.9.

In a contamination case, a plaintiff might allege a failure to detect benzene resulted from a failure to comply with the cGMPs.  *See Barnes*, 2023 WL 2456385, at *6.  What Plaintiffs allege here, though, is BPO *itself* can degrade into benzene.  (*See* Dkt. 1 ¶¶ 28-31.)  Plaintiffs note that "other forms of OTC acne treatments do not contain BPO and do not contain significant amounts of benzene."  (*Id.* ¶ 39.)  This case has nothing to do with cGMPs; it is a collateral attack on the FDA's approval of BPO as an ingredient.  (*Id.* ¶ 29 [noting Valisure is seeking market withdrawal of BPO-containing products], *id.* ¶ 31 [noting this impacts prescription and OTC BPO products].)  Plaintiffs cannot escape preemption by baldly mentioning cGMPs.  *Howard*, 2024 WL 4272931, at *9 n.9.  Plaintiffs believe BPO should not be an approved ingredient, or it should *per se* trigger extra disclosures.  This is the FDA's purview.  Plaintiffs' effort to regulate BPO is preempted.

To the extent Plaintiffs claim degradation of BPO could have been forestalled by inclusion of other ingredients (namely antioxidants), that claim is equally preempted. (Dkt. 1 ¶¶ 30, 39.) Plaintiffs cannot use their claims to change the Monograph to require additional ingredients. The Monograph does not condition use of BPO on the inclusion of an antioxidant. *See* FDA Over-the-Counter Monograph M006: Topical Acne Drug Products for Over-the-Counter Human Use, available at https://www.accessdata.fda.gov/drugsatfda_docs/omuf/OTC%20Monograph_M006-Topical%20Acne%20drug%20products%20for%20OTC%20Human%20Use%2011.23.2021.pdf *see also* 21 C.F.R. § 333.310(a); 21 C.F.R. § 333.350(c)(4). BPO is an approved ingredient, and the Monograph means what it says.

Plaintiffs do not allege Mentholatum is in violation of the Monograph. Plaintiffs' problem is with BPO as an ingredient, despite its approval by the FDA. Plaintiffs' claims are preempted.

### C.     Plaintiffs' Claims Otherwise Fail as a Matter of Law.

Preemption aside, Plaintiffs fail to state a claim. Plaintiffs' claims are based in deception, (Dkt. 1 ¶¶ 48, 56, 72, 74, 75), and thus must satisfy Rule 9(b) standards. *See Haywood v. Massage Envy Franchising*, 887 F.3d 329, 333 (7th Cir. 2018). Plaintiffs make a single, conclusory assertion of an unfair practice, (Dkt. 1 ¶ 76), but it turns on the identical conduct and cannot avoid Rule 9(b). *Haywood*, 887 F.3d at 333; *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) ("Simply adding language of 'unfairness' instead of 'misrepresentation' does not alter the fact that Camasta's allegations are entirely grounded in fraud under the ICFA.").

### i.     *Plaintiffs fail to state an ICFA claim based in misrepresentation.*

At the outset, it is critical first to identify the alleged representations Plaintiffs allege.

(1)     Plaintiffs' complaint cites Mentholatum's history and quotes from Mentholatum's website and its OXY® brand website. (*See* Dkt. 1 ¶¶ 11-14.) Plaintiffs ***do not*** allege to have ever seen these statements or visited these websites.

(2)    Plaintiffs cite a statement from Mentholatum concerning the safety and efficacy of its OXY® products, which they allege came from a website.  (*See id.* ¶¶ 18, 46.) Plaintiffs ***do not*** allege they visited this webpage, and do not identify the webpage.

(3)    Plaintiffs state they generally "relied on Defendant's representations of product safety and omissions of the existence or potential existence of benzene . . . in the Products when making their purchases."  (*Id.* ¶ 54.)

(4)    Plaintiffs include images of the Products from dates unknown.  (*Id.* ¶¶ 16, 17.)

Two problems become apparent.  <u>First</u>, Plaintiffs cannot allege an ICFA misrepresentation claim based on representations ***they did not see***.  *See Castillo v. Unilever United States, Inc.*, 2022 WL 17976163, at *3 (N.D. Ill. Dec. 28, 2022), *appeal dismissed* ("[T]he complaint does not allege that they read the website before purchasing the products.  It follows that statements on the website cannot have deceived them.").  As the Illinois Supreme Court put it: "the plaintiff must actually be deceived . . . .  If a consumer has neither seen nor heard any such statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause."  *De Bouse v. Bayer*, 235 Ill. 2d 544, 554 (2009).  Plaintiffs cannot merely point to website statements and allege misrepresentation (and much less satisfy Rule 9(b)); they would have to see these statements prior to making their purchases.  This is particularly true given they have already admitted they purchased the Products at *retail*, and not from Mentholatum.  (Dkt. 22-1, 22-2.)[6]

<u>Second</u>, the only representations Plaintiffs can be plausibly inferred to have viewed—the Product labels—do not contain any alleged misrepresentations.  Plaintiffs point to nothing on the label they claim to have been deceptive or inaccurate.  (*See* Dkt. 1 ¶¶ 17, 18, 54); *Castillo*, 2022

---

[6]    In these declarations, Plaintiffs vaguely state they relied on "the information printed on the product packaging and that appeared in product advertising that I had seen in the media."  (Dkt. 22-1, 22-2.)  Plaintiffs cite no specific representations or even the *form* of media they saw.  This is particularly critical given that Mentholatum has not used TV or radio advertising in years.

WL 17976163, at *3.  That is because their primary contention is *omission*, not misrepresentation.

Plaintiffs' ICFA claims based on affirmative misrepresentation must be dismissed.

### ii.     *Plaintiffs fail to state an ICFA claim based in omission.*

Plaintiffs' claims are, at bottom, claims of omission—that is, the Products did not disclose

the presence or risk of benzene.  (*See* Dkt. 1 ¶¶ 3, 50, 54.)  This theory fails for two reasons.

First, "[u]nder the ICFA, an 'omission' is an omission from a communication, rather than

a general failure to disclose."  *Darne v. Ford Motor Co*., 2017 WL 3836586, at *10 (N.D. Ill. Sept.

1, 2017).  Thus, Plaintiffs must point to a specific representation regarding safety that is faulty

because of an alleged omission.  As one court put it in a similar case, "without pointing to any

statement regarding safety that conveys a material omission that they relied on, they have no viable

omission-based ICFA claim."  *Castillo*, 2022 WL 17976163, at *4.  Plaintiffs cannot merely point

to an alleged failure to disclose risks on a label.  *Id.*; *see also Guajardo v. Skechers USA, Inc*.,

2021 WL 4302532, at *3 (C.D. Ill. Sept. 21, 2021).

This case is directly analogous to *Castillo*, in which the plaintiff alleged an ICFA claim

based on the failure to identify that an ingredient in a hair product could release formaldehyde, an

alleged carcinogen.  *See Castillo*, 2022 WL 17976163, at *1.  While the alleged unsafe ingredient

was identified on the label, the plaintiffs alleged that the defendant was required to disclose the

risk of formaldehyde exposure.  *Id.* at *4.  The court found that there was nothing on the label "that

conveys a material omission that they relied on" and thus were not able to rely on an omission

theory based on a general failure to disclose.  *Id.*  Here, BPO is clearly identified as an ingredient.

(*See* Dkt. 1 ¶ 17.)  Plaintiffs point to no statement on the product—and as noted above, Plaintiffs

do not allege any other statement they saw—regarding safety that conveys a material omission

they relied on.  They instead rely on a general failure to disclose, which is not a cognizable theory.

Second, Plaintiffs fail to allege facts to plausibly suggest that Mentholatum knew that BPO

16

could degrade into benzene. An ICFA omission claim "logically demands that defendants have prior knowledge of the information that they are alleged to have suppressed." *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 658 (1st Dist. 2001). Far from alleging pre-suit knowledge, Plaintiffs cite to an online OXY® statement that the OXY® acne products are safe. (Dkt. 1 ¶ 18.) The closest Plaintiffs come to alleging pre-suit knowledge is the *ipse dixit* statement that Mentholatum "failed to disclose the presence of benzene, despite its knowledge of the presence of benzene or the risk or the presence of benzene in its products." (*Id.* ¶ 47.) This allegation is not only conclusory (and inconsistent with FDA approval of BPO), but inconsistent with Plaintiffs' earlier allegation that "*[o]n information and belief*, Defendant was aware of the degradation issues . . . .". (*Id.* ¶ 40.) Plaintiffs even contend the Products *were not* properly tested, which means Mentholatum had no basis to question the FDA's BPO approval. (*Id.* ¶ 19.)

While Plaintiffs may be able to make general assertions of knowledge under Rule 9(b), allegations of knowledge must still survive Rule 8 pleading standards. *See, e.g.*, *Iqbal*, 556 U.S. at 686-87 ("Rule 9 merely excuses a party from pleading [state of mind] under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8."). A recent decision highlights this precise problem. *See Bojko v. Pierre Fabre USA Inc.*, 2023 WL 4204663, at *8-9 (N.D. Ill. June 27, 2023) ("Viewing these allegations in Plaintiffs' favor, along with the allegations that Defendant did not test its Products for benzene, the Court cannot reasonably infer that Defendant knew that the Products contained benzene.").[7] Plaintiffs fail to satisfy Rule 8 here, and their omission-based ICFA claim should be dismissed.

---

[7] Mentholatum acknowledges that court in *Bojko* reached a different conclusion as it relates to the interpretation of *Castillo* cited above. Mentholatum contends that this Court should follow *Castillo*, which involves an analogous claim, as it relates to whether an omission-based ICFA claim requires a specific representation that allegedly contains an omission.

17

### iii. *Plaintiffs' ICFA claims are barred under the ICFA safe harbor.*

Plaintiffs' ICFA claims further fail as a matter of law under the ICFA safe harbor, which bars claims stemming from "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States[.]" 815 Ill. Comp. Stat. Ann. 505/10b(1). The FDA, as detailed above, has specifically approved of BPO up to 10% and the Products at issue comply with the Monograph. Plaintiffs' ICFA claims thus fail as a matter of law. *See, e.g.*, *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 941 (7th Cir. 2001) (holding ICFA "will not impose higher disclosure requirements on parties than those that are sufficient to satisfy federal regulations.").

### iv. *Plaintiffs' unjust enrichment claims fail along with their ICFA claims.*

Finally, Plaintiffs' unjust enrichment claim fails for two reasons. First, Plaintiffs' "failure to plead any actionable deception eviscerates not only her fraud claims but her unjust enrichment claim as well." *Hillen v. Blistex, Inc*., 2017 WL 2868997, at *4 (N.D. Ill. July 5, 2017); *see also Ibarrola v. Kind, LLC*, 83 F. Supp. 3d 751, 760 (N.D. Ill. 2015) ("Absent a plausible allegation of deception, the claim for unjust enrichment must fail."). Second, unjust enrichment is not a standalone claim in Illinois—it is a remedy related to other causes of action. *See, e.g.*, *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co*., 631 F.3d 436, 447 (7th Cir. 2011) ("Under Illinois law, unjust enrichment is not a separate cause of action."); *Elward v. Electrolux Home Prod., Inc.*, 214 F. Supp. 3d 701, 709 (N.D. Ill. 2016) (dismissing unjust enrichment claim, since it is a remedy). Plaintiffs' unjust enrichment claim should thus also be dismissed with prejudice.

Dated: October 21, 2024

Respectfully submitted,

**BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP**

By: _/s/Mark S. Eisen_
Mark S. Eisen, Esq.
Sheila M. Prendergast, Esq.
**BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP**
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606
Telephone: (312) 212-4949
Facsimile: (312) 767-9192
meisen@beneschlaw.com
sprendergast@beneschlaw.com

Laura E. Kogan, Esq. (admitted _pro hac vice_)
**BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP**
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone: (216) 363-4500
lkogan@beneschlaw.com

Richard A. Grimm, III, Esq. (admitted _pro hac vice_)
**MAGAVERN MAGAVERN GRIMM LLP**
14 Lafayette Sq.
1100 Rand Bldg.
Buffalo, NY 14293
Telephone: (716) 856-3500
rgrimm@magavern.com

_Counsel for The Mentholatum Company, Inc._